**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | :    **Case No.** |
| | : |
| ALLEGHENY HEALTH NETWORK, | : |
| HIGHMARK HEALTH, HERITAGE VALLEY | : |
| HEALTH SYSTEM, INC., HERITAGE | : |
| VALLEY HEALTH SYSTEM FOUNDATION, | : |
| and VALLEY MEDICAL FACILITIES, INC. | : |
| | : |
| **Defendants.** | : |
| | : |

**COMPLAINT**

The Commonwealth of Pennsylvania, by and through its Office of Attorney General, brings this action under Section 7 of the Clayton Act, 15 U.S.C. § 18, alleging the proposed acquisition of Heritage Valley Health System ("HVHS") and its subsidiaries by Allegheny Health Network is unlawful.

This combination is likely to substantially lessen or eliminate competition in the provision of primary and secondary inpatient acute care hospital services and radiation oncology services in Beaver County and northwest Allegheny County. Further, this combination would reduce the number of competitive alternatives to health care consumers and enable the combined entity to raise prices with no competitive restraint, resulting in higher prices for primary and secondary inpatient acute care hospital services and radiation oncology services in Beaver County and northwest Allegheny County. These higher prices will be borne by health care purchasers, particularly Health Plans, employers and unions, and will likely result in an increase in prices that individual consumers pay for health insurance coverage.

I.    **Nature of the Case**

1.    On October 15, 2025, AHN and HVHS entered into an Affiliation Agreement under which AHN will acquire ownership and control of HVHS and its healthcare operations. After closing, HVHS' two acute care hospitals will become AHN's fifteenth and sixteenth hospitals, eliminating the competition between the two systems.

2.    AHN is a large regional health system that owns and operates fourteen hospitals and numerous affiliated healthcare facilities throughout western Pennsylvania.  Only one of AHN's fourteen hospitals is located outside of western Pennsylvania.

3.    HVHS is a community-based healthcare system in southwestern Pennsylvania that owns and operates two acute care hospitals and several outpatient facilities that offer a broad range of medical, surgical, and diagnostic services.  Most of HVHS' provider assets are in Beaver County, Pennsylvania.  HVHS' two acute care hospitals primarily provide services to residents from Beaver County and northwest Allegheny County, as its largest hospital, Heritage Valley Beaver, is a 285-bed facility in Beaver, Pennsylvania, and its other hospital, Heritage Valley Sewickley, is a 145-bed facility in Sewickley, Pennsylvania, which is in northwest Allegheny County across from Beaver County.

4.    HVHS and AHN are in close proximity, covering Beaver County and northwest Allegheny County.  That area serves as an area of effective competition between the two systems, where they compete on price and quality for inclusion in the same insurance networks and for the same patients.

5.    Heritage Valley Beaver is the only acute care hospital in Beaver County and serves as an important healthcare resource for residents of Beaver County and surrounding communities.  Consequently, for individuals residing in Beaver County and for health plans

seeking to offer marketable plans to residents of the county, having access to Heritage Valley Beaver is essential.

6. Despite Heritage Valley Beaver's importance to the local community, HVHS competes vigorously with neighboring health systems, including AHN.

7. AHN and HVHS are significant competitors in the general acute care inpatient hospital services market ("GAC Market"). The transaction would significantly increase concentration in an already highly concentrated GAC Market, indicating that the transaction is presumptively unlawful under Section 7 of the Clayton Act.

8. Additionally, further economic evidence suggests a significant percentage of patients, approximately 39%, would divert from HVHS to AHN if HVHS were no longer an option. These results indicate that AHN is a close substitute for HVHS in the GAC Market and a direct competitor to HVHS. Market participants such as insurers, employers, and health care providers confirm these results.

9. The transaction would also increase AHN's bargaining leverage in negotiations with health plans. By acquiring Heritage Valley Beaver, the only acute care hospital in Beaver County, AHN would obtain control of a community asset that health plans consider important or necessary for inclusion in competitive provider networks. AHN could potentially extract higher reimbursement rates from health plans and engage in system-wide contracting practices based on the strength of its system or the importance of Heritage Valley Beaver to the community.

10. AHN and HVHS are also significant competitors in the market for radiation oncology services ("Radiation Oncology Market"). Since 2003, HVHS has participated in a joint venture with the University of Pittsburgh Cancer Institute Cancer Services d/b/a UPMC Cancer Centers ("UPMC/HVHS Cancer Center Joint Venture" or "Joint Venture"), providing

radiation oncology services inside of Heritage Valley Beaver.  HVHS, as part of the Joint Venture, competes against AHN's radiation oncology program located approximately six miles from Heritage Valley Beaver.  By combining AHN and HVHS, the transaction would effectively combine the market's only competitors into a single provider of radiation oncology services.

11.     As a result, AHN's proposed acquisition of HVHS is likely to substantially lessen competition in violation of Section 7 of the Clayton Act.  Specifically, the transaction is likely to substantially lessen competition in two markets that cover Beaver County and northwest Allegheny County: 1) the GAC Market and 2) the Radiation Oncology Market.

## II.    Jurisdiction and Venue

12.     This Court has jurisdiction over the parties and subject matter of this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337(a).

13.     Defendants and their relevant subsidiaries, at all relevant times, engage in activities in or affecting "commerce" as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12. Defendants also are and, at all relevant times, have been engaged in commerce in the Commonwealth of Pennsylvania.

14.     Venue is proper in the Western District of Pennsylvania under Section 12 and 16 of the Clayton Act, 15 U.S.C. §§ 22 and 26, and under 28 U.S.C. §§ 1391(b) & (c).  Defendants transact business in this District and a substantial part of the events giving rise to this action occurred here.

## III.    The Parties

15.     The Plaintiff is the Commonwealth of Pennsylvania.  The Office of Attorney General is authorized to bring this action on behalf of the Commonwealth and its citizens for violations of the antitrust laws pursuant to 71 P.S. § 732-204(c) and Section 16 of the Clayton

Act, 15 U.S.C. § 26.  The Commonwealth brings this action as *parens patriae*, on behalf of its citizens, general welfare and economy, and as a direct purchaser of health care services from AHN and HVHS through its Medicaid and Pennsylvania Employee Benefits Trust Fund programs.  The Office of Attorney General for the Commonwealth of Pennsylvania is headquartered at 16th Floor, Strawberry Square, Harrisburg, PA 17120.

16.     Defendant Allegheny Health Network ("AHN") is a nonprofit, tax-exempt corporation organized under the laws of the Commonwealth of Pennsylvania, having its principal address at 120 Fifth Avenue, Pittsburgh, PA 15222.  AHN, an affiliate of Highmark Health, is a $5.3 billion integrated healthcare delivery system serving western Pennsylvania and western New York.  AHN's provider assets include fourteen hospitals, several ambulatory surgery centers, a research institute, and home-based health services.  AHN employs approximately 23,000 people and has a medical staff exceeding 2,600 physicians.

17.     Defendant Highmark Health is a nonprofit, tax-exempt corporation organized under the laws of the Commonwealth of Pennsylvania, having its principal address at 120 Fifth Avenue, Pittsburgh, PA 15222.  Highmark Health is the ultimate parent of AHN and other entities that collectively form an integrated healthcare delivery system.

18.     Defendant Heritage Valley Medical System, Inc. ("HVHS") is a nonprofit, tax-exempt corporation organized under the laws of the Commonwealth of Pennsylvania, having its principal address at 720 Balckburn Road, Sewickley, PA 15143.  HVHS is a community-based healthcare system located in southwestern Pennsylvania that offers a broad range of medical, surgical and diagnostic services at its two hospitals and outpatient facilities.  HVHS owns and operates Defendant Valley Medical Facilities, Inc.

5

19.     Defendant Heritage Valley Health System Foundation ("the Foundation") is a nonprofit, tax-exempt corporation organized under the laws of the Commonwealth of Pennsylvania, having its principal address at 1000 Dutch Ridge Road, Beaver, PA 15009.  The Foundation is a subsidiary of HVHS and a supporting organization of Defendant Valley Medical Facilities, Inc.

20.     Defendant Valley Medical Facilities, Inc. ("VMF") is a nonprofit, tax-exempt corporation organized under the laws of the Commonwealth of Pennsylvania, having its principal address at 720 Blackburn Road, Sewickley, PA 15143.  VMF currently owns and operates Heritage Valley Beaver, an acute care hospital located in Beaver, Pennsylvania that is licensed to operate 285 beds, and Heritage Valley Sewickley, an acute care hospital located in Sewickley, Pennsylvania that is licensed to operate 145 beds.

## IV.     The Transaction

21.     On October 15, 2025, AHN, Highmark Health, HVHS, and the Foundation entered into an Affiliation Agreement under which AHN will acquire ownership and control of HVHS and its healthcare operations.  Specifically, HVHS' subsidiary, Valley Medical Facilities, Inc. ("VMF"), which owns and operates the systems two acute care hospitals, will merge with and into HVHS immediately before closing, leaving VMF as the surviving acquired entity.  AHN will then become the sole corporate member of VMF.

22.     HVHS' two hospitals will rebrand, with Heritage Valley Beaver becoming AHN Beaver and Heritage Valley Sewickley becoming AHN Sewickley.

23.     Under the Affiliation Agreement, AHN and Highmark Health must make significant investments in health care services or infrastructure in the HVHS Region during the ten-year period following closing.

V.      **Relevant Product Markets**

A.      **The Market for General Acute Care Inpatient Hospital Services**

24.      One relevant product market is the provision of general acute care inpatient hospital services ("GAC services" or the "GAC Market") sold to health plans and their members. GAC services consist of a broad cluster of inpatient medical, surgical, and diagnostic services that require an overnight hospital stay.

25.      Hospitals sell GAC services to a variety of purchasers, including health plans such as HMOs, PPOs, and Medicare Advantage plans. Health plans reduce healthcare costs by encouraging hospitals to compete vigorously on price and quality. These plans contract with a select number of hospitals and employ financial incentives to encourage plan enrollees to use the contracted facilities.

26.      Competition between hospitals for inclusion in health plan networks constrains the overall cost of hospital care. This, in turn, permits health plans to offer health insurance to consumers at lower costs. Health plans constitute a significant percentage of hospitals' revenue from patient care.

27.      The availability of key healthcare facilities, such as hospitals, has a significant effect on the viability of a health plan. Access to certain hospitals is an important factor for employers in choosing a health plan.

28.      Patients whose treatment or condition require an overnight hospital stay, however, cannot be safely or effectively treated on an outpatient basis. Additionally, GAC services cannot be offered in an outpatient facility due to the complex nature of this level of care. For these reasons, health care purchasers, including health plans, do not view outpatient services as substitutes for GAC services. Hospitals that provide GAC services could, therefore, profitably

7

increase the price of their services without causing a significant number of health care purchasers to switch to outpatient services.

29.    GAC services constitute a relevant product market and line of commerce within the meaning of Section 7 of the Clayton Act.

**B.    The Market for Radiation Oncology Services**

30.    A separate relevant product market is the provision of radiation oncology services.

31.    Radiation oncology services involve the use of ionizing radiation to treat cancer and other medical conditions.  These services require specialized facilities, equipment, personnel, and clinical expertise.

32.    Before services may begin, a radiation oncology facility must obtain specific licenses, registrations, and design approvals from the Pennsylvania Department of Environmental Protection and the Pennsylvania Department of Health and adhere to all regulations and standards.  The costs associated with these activities are significant.

33.    Additional costs to operate a radiation oncology facility include constructing a vault to contain radiation and a linear accelerator, reaching millions of dollars.

34.    Health plans and patients generally regard radiation oncology services as distinct from other healthcare services.  Other healthcare services are not reasonable substitutes for radiation oncology services.

35.    The provision of radiation oncology services constitutes a separate relevant product market and line of commerce within the meaning of Section 7 of the Clayton Act.

**VI.    Relevant Geographic Market**

36.    The relevant geographic market for GAC Services is Beaver County, Pennsylvania and northwest Allegheny County, Pennsylvania.

37. Health plans seeking to market competitive health insurance products in the relevant geographic market must include hospitals located within that area in their provider networks.

38. Patients residing in the relevant geographic market generally seek inpatient hospital care from hospitals located within the area.

39. If prices significantly increased for GAC services, health plans and patients could not turn to hospitals outside of the relevant geographic market because they are not reasonable substitutes to hospitals in the relevant geographic market.

40. The relevant geographic market for radiation oncology services is Beaver County, Pennsylvania and northwest Allegheny County, Pennsylvania.

41. Radiation oncology patients generally seek treatment close to home because treatment commonly requires multiple visits per week over an extended period.

42. Health plans seeking to market competitive health insurance products in the relevant geographic market must include radiation oncology providers located within the relevant area.

43. If prices significantly increased for radiation oncology services, health plans and patients could not turn to radiation oncology providers outside of the relevant geographic market because they are not reasonable substitutes to radiation oncology providers in the relevant geographic market.

## VII.    Anticompetitive Effects in the General Acute Care Inpatient Hospital Services Market

### A.    The Transaction is Presumptively Unlawful Based on Market Structure

44. Courts, federal and state agencies, and economists commonly use a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration. The HHI is the sum

of the squares of the market participants. For example, a market with five firms, each with a 20% market share, would have an HHI of 2,000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2{,}000$). The HHI is low when there are many small firms and higher as the market becomes more concentrated. A market with a single firm would have an HHI of 10,000 ($100^2 = 10{,}000$).

45.     The increase in market concentration caused by the transaction is indicative of the transaction's likely negative impact on competition. The Merger Guidelines explain that a merger that significantly increases market concentration is presumptively unlawful. Specifically, a merger is presumptively unlawful when either 1) the merger results in an HHI of more than 1,800 points and an increase in HHI of more than 100 points; or 2) the merged firm's market share exceeds 30% and the HHI increases by more than 100 points

46.     The transaction is presumptively illegal in the GAC Market. The transaction would significantly increase concentration in an already highly concentrated market from approximately 2,934 points to approximately 3,166 points, an increase of 232 points. A combined AHN-HVHS would also exceed 30% market share.

**B.     Even Without the Structural Presumption, the Transaction is Unlawful**

47.     AHN's transaction of HVHS will eliminate significant competition between the two systems in the GAC Market in Beaver County and northwest Allegheny County. It will increase AHN's ability to demand higher reimbursement rates from health plans.

48.     Additionally, AHN, as a large regional health system with ownership of multiple hospitals, physicians, and ancillaries in western Pennsylvania, will be able to negotiate higher rates with health plans for HVHS on a system-wide basis.

49.     As a result of increased bargaining leverage from the elimination of significant competition and AHN's ability to engage in system-wide bargaining for HVHS, AHN's

10

acquisition of HVHS will likely increase the overall cost of healthcare, thereby harming payers, employers, and consumers.

50.     The increase in healthcare costs resulting from AHN's acquisition of HVHS will be borne directly by, or passed on to, local employers and their employees.  Self-insured employers rely on health plans to negotiate rates and provide administrative support; the employers themselves pay the full cost of their employees' health care.  As a result, self-insured employers immediately and directly bear the burden of higher rates.  Fully insured employers will bear the burden of higher rates through higher premiums.

51.     Employers, in turn, generally must pass their increased costs to their employees, in whole or in part.  Employees will bear these increased costs in the form of higher premiums, higher co-payments, co-insurance or deductibles, reduced coverage, restricted services, or reductions in wages or other benefits.

## VIII.   Anticompetitive Effects in the Radiation Oncology Services Market

52.     AHN and HVHS are significant competitors in the provision of radiation oncology services.

53.     The transaction would eliminate substantial head-to-head competition between the parties.

54.     The transaction is effectively a merger from two significant competitors to one in the relevant Radiation Oncology Market.

55.     HVHS currently participates in a radiation oncology joint venture with University of Pittsburgh Cancer Institute Cancer Services d/b/a UPMC Cancer Centers ("UPMC/HVHS Cancer Center Joint Venture" or "Joint Venture") and jointly formed UPMC/HVHS Cancer Center corporation, a competitor of AHN.

56.    The Joint Venture owns radiation oncology equipment, employs personnel necessary to provide radiation oncology services, and operates from facilities located at Heritage Valley Beaver.

57.    The Joint Venture provides radiation oncology services that compete directly with AHN's radiation oncology operations.

58.    By acquiring control of HVHS, AHN would obtain substantial influence over a facility that currently houses operations competing against AHN's radiation oncology business.

59.    The transaction therefore creates a risk that competition could be diminished through actions affecting the continued viability or effectiveness of the Joint Venture.

60.    The loss, weakening, or disruption of the Joint Venture would likely further reduce competition in an already highly concentrated radiation oncology market.

61.    Following the transaction, health plans would lose the ability to leverage competition between AHN and HVHS during contract negotiations.

62.    The transaction likely would increase reimbursement rates and reduce competitive pressure to improve quality, expand services, and innovate.

63.    Entry or expansion sufficient to replace the competition eliminated by the transaction is unlikely to be timey, likely, or sufficient.

## IX.    Count 1: Violation of the Federal Antitrust Laws – GAC Market

64.    Plaintiff repeats each preceding allegation as if fully set forth herein.

65.    As a direct result of this merger, competition for GAC services in the relevant geographic market may be substantially lessened in the following ways, among others:

A. Existing competition and the potential for increased competition between AHN and HVHS for the provision of GAC services in the relevant geographic market will be substantially reduced;

B. Concentration in the market for GAC services in the relevant geographic market will be substantially increased;

C. The likelihood of collusion in the relevant geographic market may be substantially increased; and

D. Increased concentration in the relevant geographic market may enhance the ability of the merged entity to increase prices and decrease quality of service with little fear that such price increases and decreases in quality of service will be defeated by existing fringe competitors or new market entrants.

66. The proposed transaction violates Section 7 of the Clayton Act, 15 U.S.C. § 18.

**X.** **Count 2: Violation of the Federal Antitrust Laws – Radiation Oncology Market**

67. Plaintiff repeats each preceding allegation as if fully set forth herein.

68. As a direct result of this merger, competition for radiation oncology services in the relevant geographic market may be substantially lessened in the following ways, among others:

A. Existing competition and the potential for increased competition between AHN and HVHS for the provision of radiation oncology services in the relevant geographic market will be substantially reduced;

B. Concentration in the market for radiation oncology services will be substantially increased;

C.      The likelihood of collusion in the relevant geographic market may be substantially increased; and

D.      Increased concentration in the relevant geographic market may enhance the ability of the merged entity to increase prices and decrease quality of service with little fear that such price increases and decreases in quality of service will be defeated by existing fringe competitors or new market entrants.

69.      The proposed transaction violates Section 7 of the Clayton Act, 15 U.S.C. § 18.

## XI.   **Relief Requested**

WHEREFORE, Plaintiff respectfully requests that:

A.      The Court adjudge the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

B.      The Court enjoin and restrain Defendants from carrying out the acquisition; or entering into any other agreement, understanding or plan by which AHN would merge with or acquire HVHS;

C.      The Court award Plaintiff costs and attorneys' fees;

D.      The Court grant such other and further relief as the Court deems just and proper.

Dated:  June 24, 2026

Respectfully submitted,

**COMMONWEALTH OF PENNSYLVANIA**

**OFFICE OF ATTORNEY GENERAL**

By:_____

David W. Sunday, Jr.
Attorney General
Office of Attorney General
(717) 787-3391

Sean Kirkpatrick
Executive Deputy Attorney General
Public Protection Division
(717) 787-4530

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
(717) 787-4530

Jennifer A. Thomson
Senior Deputy Attorney General
Antitrust Section
(717) 787-4530

Brandon S. Sprecher
Deputy Attorney General
Antitrust Section
(717) 787-4530

Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120

Attorneys for the Commonwealth of Pennsylvania

15